COPY

ORIGINAL
FILED

07 OCT 31 PM 3: 26

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-Filing

1 | FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
2 | CHRISTOPHER T. MICHELETTI (136446)
JOSE M. UMBERT (227318)
3 | ZELLE, HOFMANN, VOELBEL, MASON & GETTE LLP
44 Montgomery Street, Suite 3400
4 | San Francisco, CA 94104
Telephone:     (415) 693-0700
5 | Facsimile:      (415) 693-0770
cmicheletti@zelle.com
6
7 | Attorneys for Plaintiff ALUM-A-LIFT, INC.
AND THE PROPOSED CLASS
8
| [Additional Counsel listed on signature page]
9

10 | **UNITED STATES DISTRICT COURT**

11 | **NORTHERN DISTRICT OF CALIFORNIA**

12 | ALUM-A-LIFT, INC., on Behalf of Itself and All )
13 | Others Similarly Situated,                                )
                                                            )
14 |            Plaintiffs,                                    )
                                                            )
15 | v.                                                       )   Case No. _____
                                                            )
16 | ARKANSAS BEST CORPORATION, ABF              )
FREIGHT SYSTEM, INC., AVERITT EXPRESS, )   **COMPLAINT FOR VIOLATION**
17 | CON-WAY, INC., CON-WAY FREIGHT, INC.,       )   **OF §1 OF THE SHERMAN ACT**
ESTES EXPRESS LINES, FEDEX                       )
18 | CORPORATION, FEDEX FREIGHT                   )
CORPORATION, JEVIC TRANSPORTATION,      )   **CLASS ACTION**
19 | INC., SUN CAPITAL PARTNERS IV, LLC, NEW )
ENGLAND MOTOR FREIGHT, INC., OLD           )
20 | DOMINION FREIGHT LINE, INC., R+L              )   **DEMAND FOR JURY TRIAL**
CARRIERS, INC., SAIA, INC., SAIA MOTOR      )
21 | FREIGHT LINE LLC, UNITED PARCEL             )
SERVICE, INC. and YRC WORLDWIDE INC.,     )
22 |                                                           )
             Defendants.                                   )
23

C 07 5555

MMC

Received
ZHVMG

OCT 3 1 2007

File No: 3.393.0001

Plaintiff Alum-a-Lift, Inc., individually and on behalf of those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against defendants, and demands a trial by jury. Plaintiff, upon information and belief, as well as the investigation of counsel and personal knowledge alleges as follows:

## NATURE OF THE ACTION

1. Beginning in June 2003 or earlier, and continuing to the present, the defendant trucking companies have conspired to fix "fuel surcharges" for less-than-truckload truck shipments ("LTL"). Pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, plaintiff seeks treble damages, injunctive relief, attorneys' fees and costs under the antitrust laws of the United States on behalf of itself and all others similarly situated.

2. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class (defined herein) by reason of the violations, as hereinafter alleged, of §1 of the Sherman Act, 15 U.S.C. §1.

3. This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

## JURISDICTION

4. This Court has diversity jurisdiction over the Class pursuant to 28 U.S.C. § 1332(d)(2) and (6) because one or more members of the Class defined herein are citizens of a State different from one or more of the defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

5. Jurisdiction is further conferred upon this Court by 28 U.S.C. §§1331 and 1337 and by §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

6. Venue is found in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26 and 28 U.S.C. §1391(b), (c) and (d). Venue is proper in this

1

1  judicial district because during the Class Period one or more of the defendants resided,

2  transacted business, was found, or had agents in this district and a substantial portion of the

3  affected interstate trade and commerce described below has been carried out in this district.

4        7.    Defendants maintain offices, have agents, transact business, or are found

5  within this judicial district.

6        8.    This Court has *in personam* jurisdiction over each of the defendants because,

7  *inter alia*, each defendant: (a) transacted business in the United States; (b) directly sold

8  substantial quantities of LTL services throughout the United States; (c) had substantial

9  aggregate contacts with the United States as a whole; and/or (d) was engaged in an illegal

10  price-fixing conspiracy that was directed at, and had the intended effect of causing injury to,

11  persons and entities residing in, located in, or doing business throughout the United States,

12  including in this district.

13  **INTRADISTRICT ASSIGNMENT**

14        9.    A substantial part of the events or omissions which give rise to the claims in

15  this action occurred in the county of San Mateo, and as such this action is properly assigned

16  to the San Francisco or Oakland division of this Court, as provided by Civil L.R. 3-2(d).

17  **DEFINITIONS**

18      10.    As used herein, the term:

19          a.    "LTL," short for "less than truckload," means the service of providing

20               freight shipment, for carriage by truck, when the freight to be shipped

21               by a customer is less than one truckload;

22          b.    "Person" means any individual, partnership, corporation, association

23               or other business or legal entity; and

24          c.    "Class Period" refers to the period from at least June 2003, through the

25               conclusion of the trial in this matter.

26

27

28

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

## PARTIES

11.     Plaintiff Alum-a-Lift, Inc. is a resident of Georgia. Plaintiff purchased LTL services directly from one or more of the defendants during the Class Period, and paid a collusively set and imposed "fuel surcharge." The prices that plaintiff paid defendants or their co-conspirators for LTL services were greater than they would have been absent the conspiracy herein alleged. As a result of the alleged conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations alleged herein. Plaintiff asserts a claim on behalf of itself and all other direct purchasers of LTL services from one or more of the defendants during the Class Period and who paid a "fuel surcharge."

12.     Defendant Arkansas Best Corporation ("ABC") is a company incorporated in Delaware and engaged, through its subsidiaries, in motor carrier transportation operations. ABC offers LTL freight transportation services through its wholly-owned subsidiaries, including ABF Freight System, Inc., ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc., ABF Freight System Canada, ABF Cartage, Land-Marine Cargo, and FreightValue, Inc. Defendant ABF Freight System, Inc. ("ABF"), also incorporated in Delaware, is the largest subsidiary of ABC. ABF is one of North America's largest LTL motor carriers. ABC and ABF's headquarters are at 3801 Old Greenwood Road, Fort Smith, Arkansas 72903.

13.     Defendant Averitt Express ("AE") is a privately-held LTL company incorporated in Tennessee with most of its operations concentrated in the southeastern United States, and additional operations in selected cities outside this region, such as Long Beach, California. AE's headquarters are at Perimeter Place One, 1415 Neal Street, Cookeville, Tennessee 38502.

14.     Defendant Con-way, Inc. ("CW") provides LTL service, as well as truckload brokerage, airfreight forwarding, region asset based truckload service, transportation consulting, and assembly and distribution logistics programs for business-to-business supply cycle management. CW is incorporated in Delaware and has its headquarters at 2855 Campus Drive, Suite 300, San Mateo, California 94403.

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

15.     Defendant Con-way Freight Inc. is a national LTL freight transportation company and subsidiary of Con-way Inc., incorporated in Delaware.  The company recently announced that it was consolidating its three regional LTL operating companies -- Con-way Freight-Central, Con-way Freight Southern, and Con-way Freight-Western -- into a single centralized operation headquartered in Ann Arbor, Michigan, at 110 Parkland Plaza, Ann Arbor, Michigan 48103.

16.     Estes Express Lines ("Estes") is a privately held company and one of the nation's largest regional LTL trucking companies, covering all regions of the United States. Estes is incorporated in Virginia, with its principal place of business at 3901 West Broad Street, Richmond, Virginia 23230.

17.     Defendant FedEx Corporation ("FedEx") provides packaging, shipping and freight services, including LTL service, and operates FedEx Kinko's, among other business lines.  FedEx is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120.

18.     Defendant FedEx Freight Corporation is a Delaware corporation with its headquarters located at 942 South Shady Grove Road, Memphis, Tennessee 38120.  FedEx Freight Corporation is a wholly-owned subsidiary of defendant FedEx and provides LTL freight transportation services throughout the United States.

19.     Defendant Jevic Transportation, Inc. ("Jevic") is a New Jersey corporation and major regional LTL services provider focusing on the Northeastern United States. Jevic's headquarters are located at 600-700 Creek Road, Delanco, New Jersey 08075.

20.     Defendant Sun Capital Partners IV, LLC ("Sun") is a private equity fund incorporated in Delaware that purchases companies in leveraged buyouts, or LBOs.  Sun purchased defendant Jevic from defendant Saia on or about July 5, 2006, shares equitable ownership with Jevic and as part of and subsequent to the leveraged buyout extracted so much equity from Jevic that the company currently does not have assets sufficient to pay the full claims of the Class.  Sun's headquarters are located at 5200 Town Center Circle, Suite 470, Boca Raton, Florida  33486.

4

21.     Defendant New England Motor Freight, Inc. ("NEMF") is a regional LTL company incorporated in New Jersey providing service in the Northeastern United States, Eastern Canada, and Puerto Rico. NEMF's headquarters are located at 1-71 North Avenue East, Elizabeth, New Jersey 07201.

22.     Defendant Old Dominion Freight Line, Inc. ("ODFL") is a Virginia corporation that derives most of its business from LTL service. ODFL's headquarters are located at 500 Old Dominion Way, Thomasville, North Carolina 27360.

23.     Defendant R+L Carriers, Inc. ("RLC") is a privately-held LTL company, incorporated in Ohio, with operations in 45 states, Canada, and Puerto Rico. RLC operates under its own name and under the names R+L Transfer, Gator Freightways, Greenwood Motor Lines, and Paramount Transportation. RLC's headquarters are located at 600 Gillam Road, Wilmington, Ohio 45177.

24.     Defendant Saia, Inc. ("Saia") is an LTL company incorporated in Delaware with annual revenues exceeding $875 million. Saia's headquarters are located at 11465 Johns Creek Parkway, Suite 400, Duluth, Georgia 30097.  Saia has one operating subsidiary, Defendant Saia Motor Freight Line LLC, offering national, interregional, and regional LTL services.

25.     Defendant United Parcel Service, Inc. ("UPS") is a freight, package delivery, and supply chain management company incorporated in Delaware. UPS's headquarters are located at 55 Glenlake Parkway, NE, Atlanta, Georgia 30328. UPS entered the LTL market by acquiring the assets of Overnite, then one of the largest LTL companies operating in the United States.

26.     Defendant YRC Worldwide Inc. ("YRC") is a large trucking company incorporated in Delaware providing LTL service and other freight services using its own name and several other brands, including Yellow Transportation, Inc. and Roadway Express, Inc. YRC's headquarters are located at 10990 Roe Avenue, Overland Park, Kansas 66211.

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

## CLASS DEFINITION

27. Plaintiff brings this action on behalf of itself and the members of the Class comprising:

> All persons or entities who paid a "fuel surcharge" on LTL service directly to defendants or their unnamed co-conspirators from June 2003 through the conclusion of the trial in this matter. Excluded from the Class are federal government entities, the defendants, their co-conspirators and their respective parents, subsidiaries and affiliates.

## FACTS

### THE LTL INDUSTRY

28. LTL services are used by plaintiff and members of the Class as a means to transport freight within North America by ground. Plaintiff estimates, based on articles in trucking industry trade journals, that total domestic LTL industry revenue ranged from $25 to $35 billion annually during the Class Period.

29. A number of structural characteristics of the LTL industry facilitate the implementation and maintenance of price-fixing:

    a.   LTL services are a commodity product that are fungible in the sense that LTL services provided by any defendant are substitutable for the LTL services provided by any other defendant. LTL services are homogeneous services sold by defendants and purchased by plaintiff and members of the Class primarily on the basis of price.

    b.   Demand for LTL services is imperfectly inelastic, meaning the gains from collusion are substantial.

    c.   The LTL service industry in the United States is highly concentrated, facilitating coordination of prices. During the Class Period, defendants possessed a combined United States market share exceeding 75%.

    d.   There are substantial barriers to entry in the LTL industry requiring substantial time, resources, and industry knowledge to even potentially overcome. Viable entry requires the purchase or lease of hundreds of

6

1    trucks and dozens of track depots.  Similarly, viable entry requires that

2    a new provider capture a significant market share from existing

3    providers. Thus, entry is both expensive and risky.  Entry is further

4    restricted by the tight labor market for truck drivers. Current market

5    participants face significant driver shortages.  A potential competitor's

6    entry into the market also would require significant advertising

7    expenses in order to build a recognized brand name.

8    e.    Even for potential shipping experts who possess the capital and know

9    how to possibly enter the market, viable entry takes a long time. When

10    package shipping leaders FedEx and UPS decided to enter the LTL

11    market, they purchased and rebranded existing LTL companies rather

12    than attempting to enter the market directly.

13    f.    LTL services are a nondurable product. Unlike some industries,

14    shippers cannot "stock up" on LTL service when prices are low and

15    use this stockpile when shipping prices are high.

16    g.    The cartel members all sell at the retail level of distribution as

17    horizontal competitors.

18    h.    Price is the most important competitive factor in LTL shipping, and

19    the standardized nature of LTL shipping services hinders substantial

20    and material non-price competition.

21    i.    The firms have a similar cost structure. In the LTL industry there is a

22    high ratio of fixed to variable costs. Capital equipment, software,

23    advertising, depot purchase or lease, driver recruitment and training,

24    and other capital costs are high relative to variable costs.  None of the

25    defendants are greatly more efficient than the industry average.

26    j.    Newer industries are typically characterized by rapid growth,

27    innovation, and high profits.  The LTL industry is a mature one, and

28    like many mature industries, is characterized by slim profit margins,

7

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

1      creating a motivation to collude.

2      k.      The industry has a history of "cooperation." For example, several

3              regional LTL companies have formed alliances with other regional

4              LTL companies, under the claimed purpose of allowing nationwide

5              service, but in fact with many more companies than would be required

6              to offer such services. The level of cooperation within the trucking

7              industry is vastly higher than in similar industries, and has created a

8              level of trust within the industry that has facilitated defendants'

9              collusion.

10     l.      The LTL industry has become increasingly concentrated. For

11             example, in 2003 Defendant YRC, then operating under the name of

12             Yellow, merged with Roadway, then one of its largest LTL

13             competitors. The combined Yellow/Roadway entity then merged in

14             2005 with USF, further increasing LTL market concentration.

15     m.      Defendants are able to match each others' prices through publication

16             of prices, and because defendants frequently use identical pricing

17             software.

18     n.      During discussions of mergers and sales of assets from one defendant

19             to another, defendants exchange non-public competitively sensitive

20             financial information, periodically allowing them to audit and gauge

21             their co-conspirators' compliance in imposing supracompetitive "fuel

22             surcharges."

23                          **THE LTL FUEL SURCHARGE CONSPIRACY**

24     30.     Fuel surcharges in the LTL industry were instituted in the early-to-mid 1990s.

25     They initially met with limited success for several reasons. First, the surcharges imposed in

26     this earlier period, unlike those imposed more recently, varied significantly from carrier to

27     carrier. Second, in the more recent period, LTL carriers have been successful in having fuel

28     charges distinguished from base freight rates and stated as a percentage of the cost of the

8

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

base freight. Finally, increasing concentration in the LTL industry afforded those who remain the ability to collude to impose fuel surcharges successfully.

31. Fuel cost is the single substantial variable defendants must cover that is subject to wide variation in price. When a company's variable costs increase, without a concomitant offsetting increase in demand, the profits of the company will decrease because the company can only pass on a portion of the cost increase to its customers.

32. Defendants, facing drastically increased fuel costs and the likelihood of lower profits, have evaded this basic economic law by collusively imposing on their customers what are claimed to be "fuel surcharges," but which in fact bear little relation to the increase in their fuel costs. Higher fuel costs in fact were merely the pretext and an opportunity for defendants to agree among themselves to impose collusive "fuel surcharges."

33. Observers of the LTL industry, and indeed some of the defendants themselves, have noted the direct relationship between high fuel prices and LTL profits.

34. A 2006 article in *Traffic World*, a weekly trade publication covering the transportation and logistics industry, quoted Ken Hazen, president of transportation software and freight payment firm CTSI, as describing fuel surcharges as "'a profit center now . . . . Carriers are in control. They're in the catbird seat.'"

35. A transportation industry analyst at Bear Stearns noted that "'Our sense is that generally the LTL carriers make money on fuel surcharges and that earnings for LTL providers would be hurt by sustained lower fuel costs.'"

36. A 2005 article in *Fleet Owner*, a trade magazine for executives and managers of commercial trucking fleets, noted that in the past increased fuel prices were harmful to the LTL industry, but had become profitable during the recent period of increased prices:

> High diesel fuel prices usually signal harsh times for trucking. . . . That doesn't seem to be the case this year.

37. Defendant ODFL frankly admitted in its 2006 annual report that higher fuel prices increase its profitability, and lower fuel prices decrease its profitability:

9

A rapid and significant decrease in diesel fuel prices would likely reduce our revenue and operating income until we revised our pricing strategy to reflect these changes.[1]

38. Defendant YRC also made this admission:

"In general, under our present fuel surcharge program, we believe rising fuel costs are beneficial to us in the short term."

39. As did defendant ABC:

"As diesel fuel prices decline, the fuel surcharge and associated direct diesel fuel costs also decline by different degrees. Depending upon the rates of these declines and the impact on costs in other fuel and energy-related areas, operating margins could be negatively impacted."

40. These admissions are in marked contrast to the domestic passenger airline industry. For example, Southwest Airlines noted:

The cost of fuel, which was at an historically high level over the last two years, is largely unpredictable and has a significant impact on the Company's results of operations. . . . Due to the competitive nature of the airline industry, the Company's ability to increase fares is limited. . . .

41. United Airlines made the same observation:

At times, United has not been able to increase its fares when fuel prices have risen due to the highly competitive nature of the airline industry, and it may not be able to do so in the future.

\* \* \*

Higher fuel costs have had a significantly adverse effect on the Company's operating expenses in 2006 as compared to 2005.

42. On December 15, 2004, the International Herald Tribune published an article headlined "Fuel costs wipe out airline profit despite travel rebound." The article noted:

The airline industry is experiencing huge growth worldwide, in a recovery from several rough years after the Sept. 11, 2001,

---

[1] All further citations to statements by defendants and by companies in other industries being compared to defendants, unless otherwise noted, come from their respective 2006 annual reports.

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

terrorist attacks and regional problems like severe acute respiratory syndrome, or SARS. But the escalation in fuel prices produced another huge loss for the industry this year. . . .

43.     Inasmuch as fuel surcharges were serving as substantial profits centers in the LTL service industry, in a competitive market, one would expect a company to pursue greater market share by offering a more competitive fuel surcharges program to customers. However, despite customer complaints, no Defendant made any attempt to offer a more competitive LTL Fuel Surcharge Program until July of 2007 when in the midst of concerns about defendants' Fuel Surcharge programs, FedEx Freight announced that it was reducing its standard LTL fuel surcharge by 20%, in an effort to "drive a little more market share." In a truly competitive industry, FedEx (and/or other defendants) would have taken this step much earlier. Its failure to do so bespeaks the collusion that has existed in the LTL trucking sector. In a competitive market, such an obvious and effective method of responding to customers and gaining market share would not have been disregarded for so long.

## OPERATION OF THE PRICE-FIXING CARTEL

44.     When fuel prices began increasing in the early 2000s, LTL companies began imposing increasingly high "fuel surcharges." These "fuel surcharges" were not set by the ratesetting organizations, and thus are beyond the scope of their former limited antitrust immunity.

45.     Beginning in or around 2003, Defendants conspiratorially implemented LTL Fuel Surcharge programs which, although presented as individual cost-recoupment measures, allowed Defendants to boost revenues by generating profits shielded from competition.

46.     Defendants implemented their agreement by exchanging information both in private and by publicly announcing agreed-upon surcharge increases and posting fuel surcharge percentages on their websites. This allowed Defendants to monitor and enforce the agreed-upon LTL Fuel Surcharge levels.

47.     Defendants' choice of a common index, common trigger points for adjustment and a common methodology are all evidence of the fact that Defendants' LTL Fuel

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

Surcharge programs were the result of concerted, rather than unilateral, conduct. Pursuant to their unlawful agreement, Defendants set and computed their LTL Fuel Surcharges as a percentage of their customers' base rate and used common indices, timing, and trigger points for adjusting their percentages – typically computing a 0.5% surcharge for every five-cent increase in the U.S. National Average Diesel Fuel Index published weekly by the Energy Information Administration of the United States Department of Energy ("Fuel Index"). In this collusive manner, Defendants were able to maintain uniformity, or near uniformity, of the LTL Fuel Surcharges they charged their customers during the Class Period.

48.    Defendants agreed to impose identical or nearly identical "fuel surcharges" by agreeing to tie the "fuel surcharges" to the Fuel Index, regardless of the likely variation in the costs that each carrier actually paid for fuel and the very different operational characteristics and economics of each carrier. Further, in order to communicate movement in pricing and to police the cartel, each of the defendants lists its fuel surcharges on their Web sites. As a result, defendants' "fuel surcharges" move in lockstep, as illustrated in the following chart showing the fuel surcharges of the major defendants at different Fuel Index levels:

| Diesel Fuel $/Gallon | ABC | AE | CW | FedEx Freight | Jevic | ODFL | RLC | Saia | UPS | YRC |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.80 | 8.9% | 8.9% | 9.0% | 8.9% | 8.9% | 8.5% | 8.9% | 8.9% | 8.9% | 8.9% |
| 2.00 | 10.9% | 10.8% | 10.9% | 10.9% | 10.9% | 10.5% | 10.9% | 10.9% | 10.9% | 10.9% |
| 2.20 | 12.9% | 12.9% | 12.9% | 12.9% | 13.0% | 12.5% | 12.9% | 12.9% | 12.9% | 12.9% |
| 2.40 | 14.9% | 14.9% | 14.9% | 14.9% | 15.0% | 14.5% | 14.9% | 14.9% | 14.9% | 14.9% |
| 2.60 | 16.9% | 16.9% | 16.9% | 16.9% | 17.0% | 16.5% | 16.9% | 16.9% | 16.9% | 16.9% |
| 2.80 | 18.9% | 18.9% | 18.9% | 18.9% | 19.0% | 18.5% | 18.9% | 18.9% | 18.9% | 18.9% |
| 3.00 | 20.9% | 20.9% | 20.9% | 20.9% | 21.0% | 20.5% | 20.9% | 20.9% | 20.9% | 20.9% |
| 3.20 | 22.9% | 22.9% | 22.9% | 21.9% | 23.0% | 22.5% | 21.9% | 22.9% | 22.9% | 22.9% |
| 3.40 | 24.9% | 24.9% | 24.9% | 22.9% | 25.0% | 24.5% | 22.9% | 24.9% | 24.9% | 24.9% |
| 3.60 | 26.9% | 26.9% | 26.9% | 23.9% | 27.% | 26.5% | 23.9% | 26.9% | 26.9% | 26.9% |

49.    Recently the Fuel Index was near $3.00. At that price, the above defendants charged a "fuel surcharge" of 20.5%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, 20.9%, and 21.0%.

50.    The amount of the "fuel surcharge" imposed by the LTL companies on

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

shipping orders exceeds the entire cost of fuel for delivering the freight of most customers, and vastly exceeds the increase in fuel prices since the "fuel surcharge" was imposed.

51.     For example, plaintiff Alum-a-Lift shipped four crates from New York City to Winston, Georgia weighing a total 4,420 lbs and taking 650 cubic feet of space and 91 square feet of floor space. This is equal to 20.9% of the floor space of a standard two "pup" long-haul trailer, 9.2% of its weight capacity, and 17.5% of its cubic feet capacity. The largest of these capacities, the floor space, was used to calculate the price of the shipment. The distance between the two cities is approximately 920 miles. The mileage of the type of truck used for such shipments is approximately 7.5 miles per gallon. Alum-a-Lift was charged a "fuel surcharge" for this shipment of $511.54. Using the formula of $511.54 / 0.209, the total surcharge for the entire truck at that rate would have been $2,448. The total cost of the fuel, however, would have been $377 (920 miles / 7.5 mpg X diesel fuel price of $3.07). The total increased cost of fuel for the shipment over the low prices that prevailed earlier in the decade, the ostensible reason for the $2,000+ surcharge, would have been approximately $200. Using the more generous assumptions that the shipment was only half full, and the route taken was a circuitous 1,500 miles rather than a direct 920 miles, still yields a total fuel bill of $614 (in fact it would be even lower because of empty space in the truck) and a "fuel surcharge" of $1,224.

52.     One need not resort to these calculations to see "fuel surcharges" vastly exceed an LTL company's increased costs of fuel. For example, FedEx noted that for FedEx Freight, its LTL service, "While fuel costs increased substantially in 2006, fuel surcharges more than offset the effect of higher fuel costs . . . ." Similarly, CW states: "As fuel prices have risen the fuel surcharge has increased Con-way Freight's yields and revenue, and Con-way Freight has more than recovered higher fuel costs and fuel-related increases in purchased transportation."

53.     By agreeing to compute LTL Fuel Surcharges as a percentage of a customer's base rate, Defendants were ensuring that the LTL Fuel Surcharges would not correlate to any actual increase in the cost of fuel, but could be used as revenue generators and profit centers.

1  Defendants' conspiratorial practices in this regard were undertaken for purposes of

2  maximizing revenue and profit and without true regard to fuel prices as an element of their

3  costs.

4                           **INDUSTRY MEETINGS**

5       54.    Representatives of defendants have regularly met through such organizations

6  as the American Trucking Association, Inc. ("ATA") and the National Motor Freight traffic

7  Association, Inc. ("NMFTA"), in addition to the National Classification Committee ("NCC")

8  and the regional "rate bureaus."

9       55.    Defendants' agreement to use "fuel surcharges" may have been reached at

10 industry meetings held under the auspices of the NMFTA.  The following Defendants

11 (including related entities) were all members of the NMFTA:  ABF Freight System, Inc.,

12 Averitt Express, Con-way, Estes Express Lines, FedEx Freight, Old Dominion Freight Lines,

13 and UPS Freight.

14      56.    The NMFTA is the parent entity of the NCC – the motor bureau which

15 classifies freight for use with LTL rate schedules.  Members of the NMFTA hold meetings at

16 least four times a year where industry issues are discussed.  The NMFTA and the NCC,

17 therefore, presented ample opportunity and cover for discussions, coordination, and the

18 reaching of illicit agreements among defendants on "fuel surcharges."  Indeed, shippers have

19 accused the NMFTA and the NCC of representing the interests of LTL carriers to the

20 detriment of shippers, even in performing the classification duties allotted to those

21 organizations.

22      57.    Another forum that provided defendants the means and opportunity to

23 conspire was the ATA.  The ATA is a "federation made up of three unique and separate

24 entities, all working toward one common goal.  The Federation consists of:  ATA,

25 representing the national interests, the 50 affiliated state trucking associations, representing

26 the state and local interests; and the affiliated councils and the conferences, representing

27 specialized areas of the trucking industry."  This organization, which also meets regularly,

28 has identified diesel fuel costs as a "priority issue."

                                    14

**EFFECTS**

58. The unlawful contract, combination or conspiracy alleged above had, *inter alia*, the following effects:

    a.    Prices charged by defendants and their co-conspirators to plaintiff and the members of the Class for LTL services were maintained at artificially high and noncompetitive levels; and

    b.    Plaintiff and members of the Class were required to pay more for LTL services than they would have paid in a competitive marketplace unfettered by defendants' and their co-conspirators' collusive and unlawful price-fixing.

    c.    Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for LTL freight transportation.

59. During and throughout the period of the contract, combination or conspiracy alleged above, plaintiff and members of the Class directly purchased LTL services in the United States.

60. Plaintiff and the other Class members paid more for the LTL than they would have paid under conditions of free and open competition.

61. As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determinable.

62. The activities of defendants and their co-conspirators were within the flow of, and substantially affected, interstate and international commerce. During the Class Period, defendants and their co-conspirators sold and carried out LTL freight shipments in a continuous and uninterrupted flow of interstate and foreign commerce to shippers and customers throughout the United States. Each defendant and their co-conspirators used instrumentalities of interstate or foreign commerce, or both, to sell and market LTL freight transportation services. The unlawful activities of defendants and the unnamed co-

1 | conspirators have had a direct, substantial, and reasonably foreseeable effect on interstate and
2 | international commerce.

### CLASS ACTION ALLEGATIONS

4 |     63.     Plaintiff incorporates by reference as if fully set forth herein the allegations
5 | contained in the preceding paragraphs of this Complaint.

6 |     64.     Plaintiff brings this action on its own behalf and as a class action under Rule
7 | 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members
8 | of the Class.

9 |     65.     Plaintiff believes the Class numbers in the thousands, the exact number and
10 | identities being known only by defendants.

11 |     66.     The Class is so numerous and geographically dispersed that joinder of all
12 | members is impracticable.

13 |     67.     There are questions of law and fact common to the Class members. These
14 | common questions relate to the existence of the conspiracy alleged, and to the type and
15 | common pattern of injury sustained as a result thereof. The questions include but are not
16 | limited to:

17 |     a.     Whether defendants and their co-conspirators engaged in a
18 |     combination and conspiracy among themselves to fix, raise, maintain
19 |     or stabilize fuel surcharges imposed for LTL services sold in the
20 |     United States;

21 |     b.     The identity of participants in the conspiracy;

22 |     c.     The duration of the conspiracy alleged in this Complaint and the
23 |     nature and character of the acts performed by defendants and their co-
24 |     conspirators in furtherance of the conspiracy;

25 |     d.     Whether the alleged conspiracy violated §1 of the Sherman Act;

26 |     e.     Whether the conduct of defendants and their co-conspirators, as
27 |     alleged in this Complaint, caused injury to the business and property of
28 |     plaintiff and other members of the Class;

f.    The effect of defendants' conspiracy on the prices of LTL services sold in the United States during the Class Period; and

g.    The appropriate measure of damages sustained by plaintiff and other members of the Class.

68.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of other members of the Class, and plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff paid "fuel surcharges" for LTL services directly to defendants. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class. In addition, plaintiff is represented by competent counsel experienced in the prosecution of antitrust and class action litigation.

69.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

70.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class members.

71.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

72.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The Class is readily definable from records in the files of defendants and their co-conspirators. Prosecution as a class action will eliminate the possibility of repetitious litigation. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by any members of the Class who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no

17

difficulties of management that would preclude its maintenance as a class action.

**CLAIM FOR RELIEF**

**For Violation of 15 U.S.C. §1**

73. Plaintiff realleges and incorporates each and every allegation set forth above as if fully written herein.

74. From a date unknown, but at least from June 2003, and continuing through the present, defendants and their co-conspirators have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. §1.

75. In furtherance of the unlawful conspiracy, upon information and belief, each of the defendants and their co-conspirators has committed overt acts, including, *inter alia*:

    a. agreeing to charge prices at certain levels and otherwise to fix, increase, maintain or stabilize prices of fuel surcharges of LTL services sold in the United States;

    b. communicating with co-conspirators regarding prices to be charged for LTL "fuel surcharge" services;

    c. meeting with co-conspirators in order to keep the existence of the conspiracy unknown so as to foster the illegal anti-competitive conduct described herein;

    d. refraining from competition by refusing to offer fuel surcharges and LTL services at prices below the agreed-upon fixed price; and

    e. pricing and imposing fuel surcharges on LTL services at agreed-upon prices.

76. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of fuel surcharges on LTL services.

77. Defendants' anti-competitive agreement was implemented by, *inter alia*, instituting surcharges calculated by reference to publicly published indices. These coordinated price increases continued on a regular basis through the present, with the actual

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

1  and intended result that plaintiff and members of the Class paid supracompetitive prices for

2  fuel surcharges on LTL services. Defendants falsely attributed these price increases to the

3  cost of fuel. As a direct and proximate result of the fuel surcharges price-fixing conspiracy,

4  defendants have restrained competition in the LTL market and injured plaintiff and each

5  Class member in their business and property in that they have each paid a higher price for

6  fuel surcharges on LTL services than they would have paid absent the concerted unlawful

7  activity.

8      78.    The conduct of defendants and their co-conspirators constitutes a *per se*

9  violation of §1 of the Sherman Act, 15 U.S.C. §1.

10                    **PRAYER FOR RELIEF**

11     WHEREFORE, plaintiff prays that:

12     A.     The Court determine that this action may be maintained as a class action

13  under Rule 23 of the Federal Rules of Civil Procedure.

14     B.     The contract, combination or conspiracy, and the acts done in furtherance

15  thereof by defendants and their co-conspirators, be adjudged to have been in violation of §1

16  of the Sherman Act, 15 U.S.C. §1.

17     C.     Judgment be entered for plaintiff and members of the Class against defendants

18  for three times the amount of damages sustained by plaintiff and the Class as allowed by law,

19  together with the costs of the action, including reasonable attorneys' fees.

20     D.     Defendants, their affiliates, successors, transferees, assignees, and the officers,

21  directors, partners, agents and employees thereof, and all other persons acting or claiming to

22  act on their behalf, be permanently enjoined and restrained from, in any manner:

23         (a)    Continuing, maintaining or renewing the contract, combination or

24  conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy

25  having a similar purpose or effect, and from adopting or following any practice, plan,

26  program or device having a similar purpose or effect; and

27         (b)    Communicating or causing to be communicated to any other person

28  engaged in the manufacture, distribution or sale of LTL services except to the extent

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT

necessary in connection with a bona fide sales transaction between the parties to such communications.

E.    Plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: October ___, 2007                         Respectfully submitted,


By: _____

FRANCIS O. SCARPULLA (41059)
CRAIG C. CORBITT (83251)
CHRISTOPHER T. MICHELETTI (136446)
JOSE M. UMBERT (227318)
ZELLE, HOFMANN, VOELBEL, MASON
    & GETTE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
Telephone:  (415) 693-0700
Facsimile:  (415) 693-0770


NICHOLAS P. HULCHIY
BELZER, HULCHIY & MURRAY
3650 Mt. Diablo Blvd., Ste 130
Lafayette, CA 94549
Telephone:  (925) 284-9600
Facsimile:  (925) 284-9630 (fax)

Attorneys for Plaintiff ALUM-A-LIFT, INC.
AND THE PROPOSED CLASS

COMPLAINT FOR VIOLATION OF §1 OF SHERMAN ACT